**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Swapalease, Inc.,             )
                              )
               Plaintiff,     ) Case No. 1:07-CV-45
                              )
     vs.                     )
                              )
Sublease Exchange.com, Inc.,  )
                              )
              Defendant.    )

O R D E R

This matter is before the Court on Plaintiff Swapalease, Inc.'s motion for partial summary judgment on the issue of literal infringement (Doc. No. 110) and Defendant Sublease Exchange.com, Inc.'s motion for summary judgment of non-infringement of the patent-in-suit (Doc. No. 112). For the reasons that follow, Plaintiff's motion for summary judgment is not well-taken and is **DENIED;** Defendant's motion for summary judgment is well-taken and is **GRANTED**.

I. Background

This is a patent infringement action in which Plaintiff Swapalease, Inc. alleges that Defendant Sublease Exchange.com, Inc.'s ("Leasetrader") website for transferring automobile leases infringes U.S. Patent No. 6,965,874 ("the '874 Patent"). The '874 Patent claims a business method for facilitating transfers of vehicle leases between private parties.

The '874 Patent, entitled, "METHOD, APPARATUS AND PROGRAM PRODUCT FOR FACILITATING TRANSFER OF VEHICLE LEASES," has

a filing date of February 1, 2001 and was issued on November 15, 2005. The abstract describes the invention as follows:

A method for facilitating transfer of vehicle leases between parties involves providing a database of vehicle lease records concerning vehicle leases available for transfer. A search engine is provided for searching the vehicle lease database according to entered criteria, the search engine operable to identify available lease records which meet the entered criteria. Access to the search engine is provided via a computer network. Upon execution of a given search including criteria entered by a searching user, the searching user is provided, via a computer network, with vehicle lease information concerning at least one matching vehicle lease record which meets the entered criteria of the given search, if such a matching vehicle lease record exists.

'874 Patent, Abstract (Doc. No. 1, at 6).

Swapalease alleges that Leasetrader has infringed Claims 1-16, 19-20, 22-24, 26-39, and 41-43 of the '874 Patent. See Doc. No. 28-2 (Swapalease's preliminary infringement contentions). Claims 1, 29, and 43 are independent claims. The following pertinent language of Claim 1 is representative of Claims 29 and 43:

A method for facilitating the transfer of vehicle leases between parties, the method comprising the steps of:

providing a website which displays at least one control giving a visitor an option of (A) creating a record including details of the visitor and of a leased vehicle whose lease the first visitor intends to assign, and (B) viewing a list of records, each record including a description of a leased vehicle and an owner thereof;

in response to a first, listing user visiting and selecting option (A):

2

> directing the listing user to a first webpage at the
> website;
>
> receiving from the listing user at first webpage
> information pertaining to a leased vehicle and
> information to enable another visitor to the website to
> contact the listing user, wherein the information input
> by the listing user includes an incentive amount
> offered by the listing user to encourage another
> visitor to assume the lease; and
>
> storing the record created by the listing user in a
> database;
>
> in response to a second, searching user visiting the
> website and selecting option (B):
>
> directing the searching user to a second webpage at the
> website;
>
> . . .
>
> receiving financial information from the searching user
> for use in connection with initiating a lease transfer
> of a selected vehicle, said selected vehicle associated
> with a selected vehicle lease record, such that the
> searching user can thereafter assume the selected
> vehicle's lease associated with the selected vehicle
> lease record.

'874 Patent, col. 11, ll. 40-64, col. 12, ll. 15-21.

In its claim construction order, the Court interpreted
the term "first webpage" to mean "a webpage, comprised of a
screen or series of screens, that is identified by a unique
uniform resource locator." Doc. No. 104, at 19. A uniform
resource locator, or "URL," is an internet address which tells
the browser where to find an internet resource. Id. at 17.
While it is possible to design a webpage so that all of the
information contained on it is displayed on a screen or series of

3

screens through which a user can progress without changing the URL of the webpage, the Court's claim construction order made clear that different webpages have different URL's. See id. at 18-19. As a consequence of that construction, Leasetrader argues that its website does not literally infringe the '874 Patent because a listing user inputs lease information on a series of webpages, each with its own unique URL, rather than on a single, "first webpage" as required by the patent-in-suit. Furthermore, Leasetrader argues that prosecution history estoppel precludes Swapalease from asserting that its website infringes the "first webpage" element under the doctrine of equivalents because Swapalease surrendered equivalents using multiple webpages in the course of amending its claims.

Similarly, Leasetrader argues that its website does not literally infringe the "incentive amount" element because it has removed that element from its webpage. Leasetrader further argues, however, that its website does not literally infringe the '874 Patent because the "incentive amount" was entered on a different webpage from the webpage for input of lease information and the user's contact information. In addition, Leasetrader argues that prosecution history estoppel precludes Swapalease from asserting infringement of this element under the doctrine of equivalents.

In its motion for summary judgment, and in response to Leasetrader's motion for summary judgment, Swapalease argues that Leasetrader's website does literally infringe the "first webpage" element because there is only a single webpage at leasetrader.com that visitors to the website can access in order to proceed through the steps to list a vehicle. Because this webpage has its own unique URL, Swapalease argues, the website literally infringes the '874 Patent and it is irrelevant that listing user information is input on a series of different webpages. Leasetrader further argues that the Leasetrader website infringes the "incentive amount" element because prior versions of the website allowed input of an incentive amount and because the current version allows a seller to offer an "advertised payment" which is no more than a discounted lease payment.

In regard to the doctrine of equivalents, Swapalease argues that prosecution history estoppel does not apply to the "first webpage" element because there was no narrowing amendment and, even if there was, the amendment was not related to the alleged equivalent. Swapalease further argues that the amendment which added the "incentive amount" limitation does not relate to the manner in which the incentive is offered. Therefore, Swapalease argues, it is not estopped from establishing that Leasetrader's website offers an infringing equivalent of an incentive.

## II. <u>Summary Judgment Standard of Review</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence presented on a motion for summary judgment is construed in the light most favorable to the non-moving party, who is given the benefit of all favorable inferences that can be drawn therefrom. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654 (1962). "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original). The Court will not grant summary judgment unless it is clear that a trial is unnecessary. The threshold inquiry to determine whether there is a need for trial is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, 477 U.S. at 250. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. <u>Id.</u>

6

The fact that the weight of the evidence favors the moving party does not authorize a court to grant summary judgment. <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S. 464, 472 (1962). "[T]he issue of material fact required by Rule 56(c) . . . to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or a judge to resolve the parties' differing versions of the truth at trial." <u>First National Bank v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

Moreover, although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert. dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence

7

favoring the non-moving party for a jury to return a verdict for that party. Id. at 323; Anderson, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence. Id.; Anderson, 477 U.S. at 250. Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Id.

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim. Id. Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits." Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

## A. <u>Literal Infringement</u>

The parties have filed cross-motions for summary judgment on the issue whether Leasetrader's website literally infringes the '874 Patent. Determining whether a product literally infringes a patent is a two-step process. First, the court must determine the meaning and scope of the patent claims asserted to be infringed. Then, the trier of fact must compare the properly construed claims to the device accused of infringing. <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 970 (Fed. Cir. 1995). To literally infringe, the accused device or process must contain every limitation of the asserted claim. <u>Laitram Corp. v. Rexnord, Inc.</u>, 939 F.2d 1533, 1535 (Fed. Cir. 1991). The patentee bears the burden of proving infringement by a preponderance of the evidence. <u>Conroy v. Reebok Int'l, Ltd.</u>, 14 F.3d 1570, 1573 (Fed. Cir. 1994). Here, Swapalease has asserted three independent claims and thirty-six dependent claims against Leasetrader. However, Leasetrader cannot be liable for infringement of the dependent claims if it has not infringed the independent claims. <u>Wahpeton Canvas Co., Inc. v. Frontier, Inc.</u>, 870 F.2d 1546, 1552 (Fed. Cir. 1989). Determination of infringement, whether literal or under the doctrine of equivalents, is a question of fact. <u>Bai v. L & L Wings, Inc.</u>, 160 F.3d 1350, 1353 (Fed. Cir. 1998). "Thus, summary judgment of non-infringement can only be granted if, after viewing the

alleged facts in the light most favorable to the non-movant,
there is no genuine issue whether the accused device is
encompassed by the claims." Pitney Bowes, Inc. v.
Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999). In
this case, the Court concludes that Leasetrader is entitled to
summary judgment on Swapalease's claim of literal infringement
because Leasetrader's website does not infringe the "first
webpage" element of the independent claims of the '874 Patent.

       As stated, as interpreted by the Court, "first webpage"
means "a webpage, comprised of a screen or series of screens,
identified by a unique uniform resource locator."  Leasetrader
argues that its website does not literally infringe this element
because the relevant information is input by the seller over a
series of webpages, each with its own unique URL, whereas,
according to the '874 Patent, all of this information is input on
the "first webpage."  It is apparently Swapalease's position that
the Leasetrader website literally has a "first webpage" because a
visitor must first access a webpage in order to begin the process
of listing a vehicle lease for trade.

       The "first webpage" can be comprised of a screen or
series of screens on which information can be input.
Nevertheless, the "first webpage" must have its own unique URL.
As explained in the claim construction order, through use of tabs
or controls, a visitor can access multiple screens of information

10

without changing the URL, and thus remain on the same webpage. However, as Leasetrader correctly argues, the '874 Patent requires that all of the information necessary to list a new lease be input by the visitor on the "first webpage." Claim 1 states that the "first webpage" will receive "information pertaining to a leased vehicle and information to enable another visitor to the website to contact the listing user[.]" '874 Patent, col. 11. ll. 52-55. Moreover, the listing user inputs an incentive amount on the first webpage as well. Id. at ll. 55-56.

That this is a correct interpretation of the claim is reinforced by the specification. Figure 1 shows that vehicle and lease details, and owner contact information, are all entered at rectangular block 22. The specification states that each rectangular block represents a computer generated webpage. '874 Patent, col. 3 ll. 25-29. The specification goes on to state that:

> If the lease owner intends to add a lease, he or she is directed to a screen or page 22 at which the lease owner is prompted to enter lease information pertinent to the leased vehicle and lease to be assigned. Such information may include the lessors [sic] city, state and e-mail; the make, model, year, color, # of doors, and mileage of the vehicle as well as any additional comments on the vehicle; and lease information including miles allowed on lease, monthly lease payment, months remaining on lease, and down payment required to acquire the lease.

'874 Patent, col. 3, ll. 65-67; col. 4, ll. 1-7. Accordingly, it is clear that the claim requires all of the pertinent lease and

contact information, as well as the incentive amount, to be input

on the first webpage.[1]

According to Leasetrader's expert, Jorge Lázaro Diaz,

Leasetrader's website does not use a single webpage with tabs or

controls and screens to receive lease and contact information

from a listing user.  Rather, Mr. Diaz states, the Leasetrader

website uses "breadcrumbs" in which the user progresses through a

series of webpages to post the required information.[2]  Mr. Diaz

---

[1]    To be clear, the Court is not deciding the issue of
infringement by comparing the accused website to a preferred
embodiment of the patent-in-suit.  See SRI Int'l v. Mashushita
Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985)
("Infringement, literal or by equivalence, is determined by
comparing an accused product not with a preferred embodiment
described in the specification, or with a commercialized
embodiment of the patentee, but with the properly and previously
construed claims in suit.").  Rather, the purpose of referring to
the specification is to understand and give effect to the meaning
of the claim as a whole.  See Bicon, Inc. v. Straumann Co., 441
F.3d 945, 950 (Fed. Cir. 2006)(claims should be construed to give
effect to all terms of the claim); Phillips v. AWH Corp., 415
F.3d 1303, 1315 (Fed. Cir. 2005)(claims must be read in view of
the specification).

[2]    "Breadcrumb" navigation is:

       A type of text-based Web site navigation that breaks
       the site into links of categories and sub-categories
       allowing major categories of information to be linked
       in a range of sequential order. Breadcrumb navigation
       is displayed to the user, so they can easily see
       exactly where that Web page is located within the Web
       site.  While many types of Web sites use a breadcrumb
       navigation, it is becoming increasingly common for
       electronic commerce Web sites to display categories of
       products in this way.

See http://www.webopedia.com/TERM/B/breadcrumb_navigation.html
(visited January 14, 2009).

states further that each of these pages has its own unique URL and that the screen shots of the website included in the report of Mr. Ivan Zatkovich, Swapalease's expert, are cut off and do no show the URL's. Mr. Diaz states that in his report Mr. Zatkovich incorrectly identifies the sequence "Step 1>> Step 2>> Step 3>> Checkout >> Review Ad," from Leasetrader's website as using tabs instead of breadcrumbs. Mr. Diaz says that reviewing the actual pages on the website confirms that each webpage in this sequence has its own unique URL. Doc. No. 112-13, at 7-8; see also Doc. No. 112-12, Affidavit of Sergio Stiberman (confirming that each step of this sequence involves webpages with unique URL's).

On the other hand, the report of Swapalease's expert, Mr. Zatkovich, does not create a genuine issue of material fact as to whether Leasetrader's website infringes the "first webpage" element. As Leasetrader correctly argues, Mr. Zatkovich's opinion is based on an incorrect construction of "first webpage." In his report, Mr. Zatkovich states, "I also agree with plaintiff's definition that 'first webpage' means 'a screen or series of screens on an internet website.'" Doc. No. 110-12, at 48.[3] This definition, of course, ignores the claim construction rendered by the Court which includes the additional limitation that the "first webpage" is identified by its own unique URL.

---

[3] Mr. Zatkovich did not file a supplemental claim infringement report after the Court's claim construction ruling.

Consequently, Mr. Zatkovich's report completely omits any discussion or analysis of the importance, or lack thereof, of URL's on the individual webpages of Leasetrader's website. Moreover, Mr. Zatkovich states, incorrectly, that the Leasetrader website employs tabs to change screens when in fact the website uses breadcrumb navigation to proceed through a series of different webpages, each with its own unique URL. Therefore, Mr. Zatkovich's opinion is insufficient for Swapalease to meet its burden of demonstrating that Leasetrader's website literally infringes the "first webpage" element of the patent-in-suit. E.g., Zelinski v. Brunswick Corp., 996 F. Supp. 757, 764 (N.D. Ill. 1997)("Mr. Shifley's statements rest on an incorrect claim interpretation and therefore cannot create a factual dispute.").

Because Leasetrader's website does not literally infringe the "first webpage" element of the independent claims, the Court need not address whether Leasetrader has literally infringed the "incentive amount" element of those claims. Similarly, the Court need not address whether Leasetrader's website literally infringes the dependent claims. Those claims fail with the finding of non-infringement of the independent claims.

Accordingly, Swapalease's motion for partial summary judgment on the issue of literal infringement is not well-taken

and is **DENIED**; Leasetrader's motion for summary judgment on literal infringement is well-taken and is **GRANTED.**

## B. Doctrine of Equivalents

Leasetrader also moves for summary judgment on the issue of infringement under the doctrine of equivalents. Leasetrader argues that prosecution history estoppel precludes Swapalease from claiming that its website infringes the "first webpage" element because it surrendered equivalents which use multiple webpages to receive listing user and lease information in the course of amending its claims. Leasetrader also argues that prosecution history estoppel bars Swapalease from proving that its website infringes the "incentive amount" element under the doctrine of equivalents. Finally, Leasetrader argues that Swapalease should be foreclosed from asserting the doctrine of equivalents against its website because Swapalease's infringement contentions failed to identify alleged infringing equivalents on its website. Because the Court agrees with Leasetrader that prosecution history estoppel precludes recovery for infringement under the doctrine of equivalents on the "first webpage" element, it need not address the other grounds raised by Leasetrader in its motion.

An accused device may still infringe a patent under the doctrine of equivalents even if it does not literally infringe the claimed invention. K-2 Corp. v. Salomon S.A., 191 F.3d 1356,

1366 (Fed. Cir. 1999). Infringement may be found under the
doctrine of equivalents where there is equivalence between the
elements of the accused product or process and the claimed
elements of the patented invention. DePuy Spine, Inc. v.
Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1016 (Fed. Cir.
2006). The doctrine of equivalents was adopted because:

> [t]he language in the patent claims may not capture
> every nuance of the invention or describe with complete
> precision the range of its novelty. If patents were
> always interpreted by their literal terms, their value
> would be greatly diminished. Unimportant and
> insubstantial substitutes for certain elements could
> defeat the patent, and its value to inventors could be
> destroyed by simple acts of copying.

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S.
722, 731 (2002). "Infringement may be found under the doctrine
of equivalents when, absent estoppel, every limitation of the
asserted claim, or its equivalent, is found in the accused
subject matter, the latter differs from what is literally claimed
only insubstantially, and it performs substantially the same
function in substantially the same way to achieve substantially
the same result." Wright Medical Technology, Inc. v. Osteonics
Corp., 122 F.3d 1440, 1444 (Fed. Cir. 1997); see also DePuy
Spine, 469 F.3d at 1017 ("[T]he "all elements" rule informs a
doctrine of equivalents analysis by requiring that equivalence be
assessed on a limitation-by-limitation basis, rather than from
the perspective of the invention as a whole, and that no
limitation be read completely out of the claim."); KCJ Corp. v.

16

<u>Kinetic Concepts, Inc.</u>, 223 F.3d 1351, 1359 (Fed. Cir. 2000)

("Infringement under the doctrine of equivalents requires that

the accused product contain each limitation of the claim or its

equivalent.").

Prosecution history estoppel is an important limitation

on the application of the doctrine of equivalents.  <u>Warner-</u>

<u>Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 30 (1997).

In <u>Festo</u>, the Supreme Court explained:

> Prosecution history estoppel requires that the claims
> of a patent be interpreted in light of the proceedings
> in the PTO during the application process.  Estoppel is
> a rule of patent construction that ensures that claims
> are interpreted by reference to those that have been
> cancelled or rejected. The doctrine of equivalents
> allows the patentee to claim those insubstantial
> alterations that were not captured in drafting the
> original patent claim but which could be created
> through trivial changes.  When, however, the patentee
> originally claimed the subject matter alleged to
> infringe but then narrowed the claim in response to a
> rejection, he may not argue that the surrendered
> territory comprised unforeseen subject matter that
> should be deemed equivalent to the literal claims of
> the issued patent. On the contrary, by the amendment
> the patentee recognized and emphasized the difference
> between the two phrases and the difference which the
> patentee thus disclaimed must be regarded as material.
> A rejection indicates that the patent examiner does not
> believe the original claim could be patented.  While
> the patentee has the right to appeal, his decision to
> forgo an appeal and submit an amended claim is taken as
> a concession that the invention as patented does not
> reach as far as the original claim.  Were it otherwise,
> the inventor might avoid the PTO's gatekeeping role and
> seek to recapture in an infringement action the very
> subject matter surrendered as a condition of receiving
> the patent.
>
> Prosecution history estoppel ensures that the doctrine
> of equivalents remains tied to its underlying purpose.

Where the original application once embraced the
purported equivalent but the patentee narrowed his
claims to obtain the patent or to protect its validity,
the patentee cannot assert that he lacked the words to
describe the subject matter in question. The doctrine
of equivalents is premised on language's inability to
capture the essence of innovation, but a prior
application describing the precise element at issue
undercuts that premise. In that instance the
prosecution history has established that the inventor
turned his attention to the subject matter in question,
knew the words for both the broader and narrower claim,
and affirmatively chose the latter.

535 U.S. at 733-35 (internal citations, brackets, ellipses and

quotation marks omitted).

In light of Warner-Jenkinson and Festo, the Federal

Circuit synthesized the procedure for the application of

prosecution history estoppel to the doctrine of equivalents:

The first question in a prosecution history estoppel
inquiry is whether an amendment filed in the Patent and
Trademark Office ("PTO") has narrowed the literal scope
of a claim. Pioneer Magnetics, Inc. v. Micro Linear
Corp., 330 F.3d 1352, 1356 (Fed. Cir. 2003). If the
amendment was not narrowing, then prosecution history
estoppel does not apply. But if the accused infringer
establishes that the amendment was a narrowing one,
then the second question is whether the reason for that
amendment was a substantial one relating to
patentability. See id. When the prosecution history
record reveals no reason for the narrowing amendment,
Warner-Jenkinson presumes that the patentee had a
substantial reason relating to patentability;
consequently, the patentee must show that the reason
for the amendment was not one relating to patentability
if it is to rebut that presumption. See id. (citing
Warner-Jenkinson, 520 U.S. at 33, 117 S. Ct. 1040). In
this regard, we reinstate our earlier holding that a
patentee's rebuttal of the Warner-Jenkinson presumption
is restricted to the evidence in the prosecution
history record. Festo VI, 234 F.3d at 586 & n. 6; see
also Pioneer Magnetics, 330 F.3d at 1356 (stating that
only the prosecution history record may be considered

18

in determining whether a patentee has overcome the
<u>Warner-Jenkinson</u> presumption, so as not to undermine
the public notice function served by that record). If
the patentee successfully establishes that the
amendment was not for a reason of patentability, then
prosecution history estoppel does not apply.

If, however, the court determines that a narrowing
amendment has been made for a substantial reason
relating to patentability-whether based on a reason
reflected in the prosecution history record or on the
patentee's failure to overcome the <u>Warner-Jenkinson</u>
presumption-then the third question in a prosecution
history estoppel analysis addresses the scope of the
subject matter surrendered by the narrowing amendment.
<u>See</u> <u>Pioneer Magnetics</u>, 330 F.3d at 1357.  At that point
<u>Festo VIII</u> imposes the presumption that the patentee
has surrendered all territory between the original
claim limitation and the amended claim limitation. <u>See</u>
<u>Festo VIII</u>, 535 U.S. at 740, 122 S. Ct. 1831. The
patentee may rebut that presumption of total surrender
by demonstrating that it did not surrender the
particular equivalent in question according to the
criteria discussed below.  Finally, if the patentee
fails to rebut the <u>Festo</u> presumption, then prosecution
history estoppel bars the patentee from relying on the
doctrine of equivalents for the accused element. If the
patentee successfully rebuts the presumption, then
prosecution history estoppel does not apply and the
question whether the accused element is in fact
equivalent to the limitation at issue is reached on the
merits.

<u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.</u>,

344 F.3d 1359, 1366-67 (Fed. Cir. 2003).

As indicated, if the accused infringer demonstrates a

narrowing amendment, the patentee bears the burden of showing

that the amendment did not surrender a particular equivalent.

<u>Id.</u> at 1368.  The patentee can meet this burden in three ways: 1)

he can demonstrate that the alleged equivalent would have been

unforeseeable at the time of the narrowing amendment; 2) he can

demonstrate that the rationale underlying the narrowing amendment bore no more than a tangential relation to the equivalent at issue; or 3) there is some other reason suggesting that the patentee could not reasonably have been expected to have described the alleged equivalent.  Id.

In this case, Leasetrader argues that in the course of prosecuting the '874 Patent, Swapalease amended its claims and thereby surrendered equivalents in which user and lease information is input on more than one webpage.  Swapalease, on the other hand, argues that although it amended its claims, there was no narrowing amendment with regard to the "first webpage" element.  Swapalease further contends that the claims were amended to overcome the Waldo and Lineback prior art references cited against the claims by the patent examiner, neither of which teach a first webpage.  Therefore, Swapalease argues, the amendment is only tangentially related to the equivalent at issue.

Swapalease submitted forty-one claims with its original application for what became the '874 Patent.  Original claim 1 claimed:

A method for facilitating transfer of automobile leases includes the steps of:

providing a website which displays a menu giving a visitor an option of either creating a record including details of the visitor and of a leased automobile whose lease the visitor intends to assign, or viewing a list

of records, each record including a description of a leased automobile and an owner thereof;

if the visitor intends to create a record:

directing the visitor to <u>a page at the website</u> where the visitor can input information pertaining to a leased automobile and information to enable another visitor to the website to contact the visitor;

storing the record created by the visitor in a database; and

if the visitor intends to view a record or records:

directing the visitor to a page at the website where the visitor can view at least one record of a leased automobile.

Doc. No. 112-6, at 1 (emphasis added).

In an office action summary dated March 23, 2003, however, the patent examiner rejected all of the claims pursuant to 35 U.S.C. § 103(b) on the grounds that it would have been obvious to one skilled in the art to combine the Lineback and Waldo prior art references to teach a method of managing leases in an online system with multiple clients. Doc. No. 115-4, at 2. The patent examiner also rejected each of the claims pursuant to 35 U.S.C. § 112, ¶ 2, for failing to point out and specifically claim what the applicant regards as the invention. The examiner found that the "independent claims are too broad to sufficiently indicate the distinctive characteristics of the disclosure." Doc. No. 115-4, at 2-3.

In response to this office action, Swapalease argued
that, in rejecting the claims pursuant to § 112, ¶ 2, the
examiner failed to point out any specific language that was
objectionable or indefinite. Doc. No. 115-5, at 5-6. With
regard to the examiner's obviousness rejection, Swapalease argued
that Lineback did not teach or suggest online transfer of leases,
nor did Lineback teach a functionality for storing records
detailing leased automobiles and their owners. Id. at 7.
Swapalease also distinguished Waldo on the grounds that Waldo did
not concern automobile leases, nor did Waldo involve any
financial transaction. Id. at 8. Rather, according to
Swapalease, Waldo disclosed a networked computer environment for
clients to lease system resources for periods of time. Id.
Accordingly, Swapalease requested reconsideration and allowance
of the claims as originally submitted.

Nevertheless, in a final office action dated August 27,
2003, the examiner maintained his rejection of the original
claims. The examiner again concluded that the claims were
unpatentable as obvious in view of Lineback and Waldo.
Similarly, the examiner found that the claims failed to point out
and specifically claim what Swapalease regarded as the novelty of
the invention. Doc. No. 115-6, at 4-5.

Swapalease then filed a notice of appeal of the
rejection of its claims with the Board of Patent Appeals and

Interferences. Doc. No. 115-7. While this appeal was still
pending, Swapalease had a telephone interview with the examiner
which, on September 17, 2004, resulted in the submission of
amendments to the original claims, as well as three new claims.
Doc. No. 115-8. According to Swapalease's remarks in support of
the amendments, during the interview, the examiner had commented
that the proposed amendments defined the invention over the prior
art. <u>Id.</u> at 3. In any event, amended proposed claim 1 stated:

> 1. A method for facilitating transfer of <u>vehicle</u> leases
> including the steps of:
>
>> providing a website which displays a menu giving a
>> visitor an option of either creating a record
>> including details of the visitor and of a leased
>> <u>vehicle</u> whose lease the visitor intends to assign,
>> or viewing a list of records, each record including
>> a description of a leased <u>vehicle</u> and owner thereof;
>>
>> if the visitor intends to create a record:
>>
>> directing the visitor to a page at the website where
>> the visitor can input information pertaining to a
>> leased <u>vehicle</u> and information to enable another
>> visitor to the website to contact the visitor,
>> <u>wherein the information input by the visitor</u>
>> <u>includes an incentive amount offered by a visitor to</u>
>> <u>encourage another user to assume the lease</u>;
>>
>> storing the record created by the visitor in a
>> database; and
>>
>> if the visitor intends to view a record or records:
>>
>> directing the visitor to a page at the website where
>> the visitor can view at least one record of a leased
>> <u>vehicle</u>.

Doc. No. 115-8, at 5 (emphasis in original)(internal edits

omitted).  As can be seen, in this submission, original claim 1 was amended to change "automobile" to "vehicle."  Additionally, the proposed amendment added the limitation of offering an incentive amount to assume a lease.

On December 15, 2004, the examiner issued a Notice of Allowability canceling original claims 1-44 and allowing new claims 45-87.  Doc. No. 115-9.  As allowed, new claim 1 (claim 45 in the Notice of Allowability) stated in relevant part:

A method for facilitating the transfer of vehicle leases between parties, the method comprising the steps of:

> providing a website which displays at least one control giving a visitor an option of (A) creating a record including details of the visitor and of a leased vehicle whose lease the first visitor intends to assign, and (B) viewing a list of records, each record including a description of a leased vehicle and an owner thereof;
>
> in response to a first, listing user visiting and selecting option (A):
>
> directing the listing user to a <u>first webpage</u> at the website;

Doc. No. 115-9, at 4 (emphasis added).  Insofar as the record before the Court is concerned, the Notice of Allowability is the first occasion on which the "first webpage" limitation appears in the claims.

The first issue in deciding whether prosecution history estoppel bars the doctrine of equivalents is whether there was a narrowing amendment with respect to the "first webpage" element.

24

Swapalease argues that there was no narrowing amendment with respect to the "first webpage" element because there was no citation to prior art based on the number of webpages and because it used "a page," "a web page," "at least one webpage," and "first webpage" throughout the prosecution history of the patent.

In response, the Court observes that the fact that Swapalease used different variations of "page" or "webpage" throughout the prosecution history does not answer the question whether there was a narrowing amendment. The important fact is that the claim was amended to recite a "first webpage" and, thus, "first webpage" became a material element of the claim. See Warner-Jenkinson, 520 U.S. at 32 (stating that an amendment establishing a lower pH limit of 6.0 became a material element of claim by its mere inclusion). Moreover, the Court concludes that there was a narrowing amendment as to "first webpage." As originally submitted, claim 1 recited "a page at the website." See supra at 21. Under Federal Circuit precedent, the term "a" or "an" in a claim usually means one or more. Collegenet, Inc. v. ApplyYourself, Inc., 418 F.3d 1225, 1232 (Fed. Cir. 2005). Thus, as originally drafted, "a page at the website" encompassed one or more webpages. While "page" and "webpage" may be interchangeable terms, the modification of "page" by adding the adjective "first" clearly denominates a single, discrete webpage. In the context of this claim, "first" obviously means "number one

in a countable series." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
(1971), at 857. This conclusion is buttressed by the fact the
'874 Patent claims a "first webpage" and a "second webpage."
Thus, the "first webpage" and "second webpage" are specific
webpages, as the Court's claim construction order highlighted.
<u>See</u> Doc. No. 104, at 19 (holding that the "second webpage" is
different from the "first webpage"). Accordingly, the evolution
of the claim from "a page" to "first webpage" during the
prosecution history represents a narrowing amendment because the
claim was reduced from one or more webpages to a single, specific
webpage.

Having concluded that there was a narrowing amendment,
the question becomes whether the reason for the amendment was a
substantial one related to patentability. <u>See</u> <u>supra</u>, at 18. If
no reason for the amendment occurs in the prosecution history,
the Court must presume that the patentee had a substantial reason
for the amendment related to patentability. <u>Id.</u> In this case,
Swapalease concedes, perhaps not intentionally so, that the
prosecution history does not reflect a reason for the amendment
from "a page" to "first webpage." <u>See</u> Doc. No. 115, at 7
("Demonstrating these points is the fact that there is not a
single citation to prior art, amendment, or argument based on a
webpage, first webpage, or variation thereof, in any of the
following notable portions of the prosecution history . . . .").

Confirming this point, review of the prosecution history reveals no reason for amending the claim from "a page at the website" to the "first webpage" limitation. Accordingly, the Court concludes that the presumption arises that this claim was amended for a substantial reason related to patentability.

Because this presumption now arises, the burden shifts to Swapalease to show that the amendment did not surrender the particular equivalent. See supra, at 19. In attempting to meet this burden, Swapalease argues that the reason for the amendment was only tangentially related to the equivalent at issue. Swapalease argues that the claims were amended to overcome the Lineback and Waldo prior art references cited by the examiner. Neither Lineback or Waldo, Swapalease contends, teaches a webpage element. Therefore, the argument continues, the reason for amending the webpage element was only tangentially related to the multiple page equivalent at issue.

The Court finds that Swapalease has not adduced sufficient evidence on summary judgment to meet its burden of overcoming the presumption that the claim was amended for substantial reasons related to patentability. The Court notes that an "amendment made to avoid prior art that contains the equivalent in question is not tangential." Festo, 344 F.3d at 1369. "It does not follow, however, that equivalents not within the prior art must be tangential to the amendment." Chimie v.

<u>PPG Industries, Inc.</u>, 402 F.3d 1371, 1383 (Fed. Cir. 2005).
Accordingly, in this case, it does not necessarily follow that
the amendment was tangential just because the equivalent was not
in the prior art cited by the examiner.

Accepting the premise that the Lineback and Waldo prior
art references do not involve a webpage element, still unanswered
by the prosecution history is the reason Swapalease amended the
claim from "a page at the website" to "first webpage."  The
silence of the record, however, necessarily leads to the
conclusion that Swapalease has not met is burden of showing that
the reason for the amendment was tangential to the equivalent.
Indeed, the reason for the narrowing amendment must be
objectively apparent from the prosecution history.  <u>Festo</u>, 344
F.3d at 1369.  For instance, in <u>Biagro Western Sales, Inc. v.
Grow More, Inc.</u>, 423 F.3d 1296 (Fed. Cir. 2005), during the
prosecution history, the patentee amended a claim to add both an
upper and lower limit of the amount of phosphorous-containing
acid or salt.  In arguing against prosecution history estoppel to
foreclose a finding of infringement under the doctrine of
equivalents, the patentee (Biagro) argued that only the addition
of the lower limit was necessary to distinguish the invention
over the prior art.  <u>Id.</u> at 1306.  As the Federal Circuit stated,
"In effect, Biagro is arguing that there was no reason for adding
an upper limit of 40%."  <u>Id.</u>  Therefore, the patentee argued, the

upper limit amendment was only tangential to an equivalent at the upper end of the range. Id. The Federal Circuit, however, rejected this argument: "[I]n this case, since the prosecution history shows no reason for adding an upper limit to the concentration range, Biagro cannot claim that the rationale for the amendment is merely tangential." Id.; see also Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp., 523 F.3d 1304, 1316 (Fed. Cir. 2008) ("Silence does not overcome the presumption."); Festo, 344 F.3d at 1371-72 ("If the prosecution history reveals no reason for the amendment, the presumption is not rebutted."). Because in this case the prosecution history is silent as to the reason for the amendment, Swapalease has not overcome the presumption that prosecution history estoppel applies.

Having determined that prosecution history estoppel applies in this case, the final task is to determine the scope of the surrender of equivalents. See supra, at 19. Here, the Court concludes that Swapalease surrendered equivalents in which the user and lease information is input over multiple webpages. As stated above, as originally drafted, by use of the term "a page," the claim encompassed one or more webpages. See supra, at 24-26. As further stated, however, the amendment to "first webpage," narrowed the scope of the claim to a single, discrete webpage. Therefore, in amending its claims Swapalease surrendered equivalents using more than one webpage. Consequently,

Leasetrader is entitled to summary judgment that its website, which employs multiple webpages for receiving user and leased vehicle information, does not infringe the '874 Patent under the doctrine of equivalents.

Accordingly, Leasetrader's motion for summary judgment of non-infringement under the doctrine of equivalents is well-taken and is **GRANTED.**


**IT IS SO ORDERED**

Date January 27, 2009                    s/Sandra S. Beckwith
                                  Sandra S. Beckwith
                          Senior United States District Judge